Thank you. Good morning, your honors. My name is Cori Flanders and I represent the appellant Pacific Fisheries. This case has had a very long history through the courts and we're hoping to get resolution. It raises concerns about what the IRS is truly trying to protect here. This is information that they were seeking, that the Russian government was seeking for years. I think it's now 10 to 15 years old and stale. And the taxpayer, this all started when the taxpayer inadvertently discovered that his bank account... I know it's not exactly necessarily germane at this point, but why does it matter? It's still, again, it matters because... Is it a matter of principle? I would say it's both. I mean, for me, yes, it is a matter of principle, but for the taxpayer, I think that they have now this feeling of mistrust and feeling that they don't understand why the government was able to give information to these Russian authorities, where under the laws of the United States they'd be entitled to see this, but because the Russian government requested that they not disclose this information, their rights are being trumped. So they have no clue what information about them was turned over to the Russian government and they went out of business after that. So, I mean, there is that, I don't know if it's in the record, but why... Went out of business in Russia? Yeah, basically they had a big fishing vessel that basically that they believe that Russia used this information against them and they are now underwater there. So it is, I think, a very personal thing to them of what was turned over to the Russian authorities when they know that this treaty request from the very beginning had issues. From the very beginning, it was requesting information from, I think it was seven to ten years old, where no possible statute of And the IRS blindly followed this treaty request and did a summons request for the bank account information while it was giving them information that it had in its possession. It was then trying to collect information from third parties about this taxpayer to turn over to the Russian authorities. Well, the taxpayer inadvertently found out about this and basically immediately the council called the IRS and said, this summons on its face has a lot of Well, the government basically did nothing and they were required to file suit. And finally, the IRS conceded that it was a deficient summons and pulled it back. And in that proceeding, the taxpayers requested discovery. They wanted to know what else had been turned over. You know, damage control. What has happened here? What's going on? The court ordered that because they withdrew the summons initially, that it was moot. The case was over so they didn't have to produce discovery. So they went the FOIA route. They filed a Freedom of Information Act request and the government initially didn't respond or produce anything with respect to that. So they were forced to file a complaint. And they filed a complaint and the very initial document they got back from the answer from the government was there are no responsive documents. You get nothing. And then they reversed that position and then did give them some claims. And so then they had another lawsuit and then they got to come to the Ninth Circuit. And then they got, your client got attorney's fees under FOIA resettlement? I believe it was basically, it was almost a sanction, the attorney's fees, because they forced the client to litigation and because they initially took the position there were no records and then they finally did. It was more, I think, of a delay on the part of the government with respect to this case. And during that case they did take the position that some of the documents were exempt from disclosure under 6105, which is confidential treaty information is not required to be disclosed. And it was remanded, the court remanded that issue to see whether that actually was a valid exemption. Upon briefing they discovered that 6105, under the plain language of it, it wasn't confidential treaty information because the treaty itself specifically authorized the disclosure. It says that any tax information that is exchanged pursuant to this treaty is exchangeable if it is, and is producible if it is according to the U.S. domestic laws. And they realized that in the United States a taxpayer is entitled to their own return information. And they concede this. They concede that under the treaty and the United States tax laws the taxpayer would be entitled to this information. To their own requesting. It's their own information here. Well, when you say their own information, what does that entail? Basically, it would be the tax returns, transcripts, any information that the IRS would have. I think they have a file on each individual. Are you saying that they, the internal IRS file? Correct. Correct. And that's the information, it's our understanding, which was turned over to the Russian tax treaty before they realized that this was a defective treaty request and defective summons. So they did, and we do know from the limited documents we received that information was in fact turned over pursuant to it. And we just want to know what it was and what's in that file. And again, absent this impairment of tax administration, if he lived here in the United States and he just requested this, they would have no exemption. He'd be entitled to this information. So it's just shocking to me that they would have this side deal with these foreign parties that if they request that this information be confidential. It's not a side deal. Well, it is in a way because the treaty doesn't authorize it. So basically, the treaty itself says they made this deal with the United States. Russia and the United States made this treaty. And under the treaty, Russia knew this information would be available to the taxpayers under the U.S. laws. But if they just randomly say, we'd prefer you keep it confidential, the government then will abide by that and make a claim of impairment of tax administration. Excuse me. As I read 6105A, it says, tax convention information shall not be disclosed. This is tax convention information. Correct. But if you look at the definition of tax convention, it is tax convention information that is confidential under the treaty itself. But that depends on whether one of the contracting state parties has requested that it remain confidential. And here, Russia did request it remain confidential, didn't it? Is that not it? I think I understand your question. Under the treaty, if they request it be confidential, does that make it confidential treaty information? And it doesn't. Under the statute and under the actual treaty itself, that's where you look. In the treaty itself, and the government concedes it. So it's undisputed that this is not 6105 material. It's not confidential tax treaty. It would be available to the taxpayer under 6103, but for the impairment of tax administration is claimed by the government to be based on a Russian request that the information be kept confidential. That's right. And the government takes the position that once Russia asks that, that for purposes of future trust and cooperation between the two countries, that the matter be kept confidential. What's wrong with that? That's unsettling to me. It's unsettling that they request it. It may be unsettling to you, but there are many things that may be unsettling to you. I understand. The question is, why is it against the law? It's against the law because under the treaty itself that they agreed to, the United States and the Russian authorities agreed to a treaty that they would disclose information as it would be disclosed under the U.S. laws. What is the provision of the treaty that says that? It is under article. I apologize, Your Honor, it's under article the tax. Article 25 of the tax treaty basically says any information received by the contracting state, which would be the United States here, shall be treated as confidential in the same matter as information obtained under the U.S. laws. Under the domestic laws of that state. Is that both received and sent? Correct. And I think we argued before that there was a distinction. I vacated that on appeal. I think there definitely is a distinction, but I didn't raise that as an appeal. So let's go back. The precise information that you want is information that the U.S. turned over to Russia, correct? Yes, and the information that Russia gave to the United States requesting this information, correct. And your claim isn't a claim under the treaty, is it? It's a FOIA claim. No, it's a freedom of information. Because the treaty is not necessarily self-executing that you have a private cause of action under the international treaty, correct? Correct. So basically we're in a domestic world of FOIA, and then the government says, well, under one of the exemptions we can put forth information and declarations that say this would actually impair the ability to have bilateral tax treaties if we have to turn all this stuff over. So what more could they say to invoke that exemption? I mean, they've said it, and I realize it's a little like state secrets, you know, like, okay, it's under wraps, but I can't tell you all the reasons because it is under wraps. But nonetheless, we have in the past countenanced that. So why shouldn't we do that here? In the past, when courts have upheld the impairment of tax administration, it's been in situations where there have been ongoing investigations and when it hasn't been some type of indefinite period. And I think there were issues about the standard of review, and the district court is to make a de novo review of the record and determine whether there are sufficient facts. And then once there are sufficient facts, to make an independent decision. My point is, is there were not sufficient facts to make an independent decision. And basically the district court admitted that when he said, the court determines O'Donnell's conclusions are entitled to deference. The court is not in a position to independently determine what actions on the part of the U.S. government would or would not impair treaty relations. So basically he took that declaration wholesale. It didn't provide any specific facts, such as in the past, when we have disclosed information, our relationships with China have gone. In the past, when we've done it with Russia, we have seen situations. So there were not facts presented for the court to look at it independently. Ms. McDonnell, O'Donnell I guess he is, O'Donnell, actually put in a second declaration because the first one was a little thin, right? Correct, Your Honor. Okay. So it's the second declaration that is subject to scrutiny here? Correct. And again, it does not have the specific facts. The reviewing court, it's my understanding that the review for you, the reviewing court, is to look at, number one, are there sufficient facts in that declaration for somebody to determine independently whether tax administration would in fact be impaired. And the concern here is under FOIA Exemption 3, what Congress was trying to prevent was unfettered discretion on the part of agencies. They wanted to make sure that basically courts and agencies weren't just making this decision in their judgment. Do you have any good cases for us to look at where they tipped the exemption because of lack of specificity? I cited three cases. I think those will give you a really good idea. Chamberlain, and do you want me to give you the cites on those?  Okay. Chamberlain, Curry, and there's one other one, Shurmack. And you will see in every single one of those cases there was an ongoing pending investigation. And also in Capri, that's a district court case that basically said. Could I just stop you there? That doesn't really tell us about, get us to the bottom line about the specificity. Okay. Because you're saying, well, in those cases there's an ongoing investigation, so that might be a foundation. But is that the rule that we want us to adopt, that because there is a close not ongoing that that somehow changes the rules? I think it's a factor. I think really in Chamberlain what might be helpful is the court looked at, they did an analysis of why Exemption 3 is there in a similar situation. The FAA was relying on a statute that basically said that in their judgment, if disclosure would adversely affect an individual and is not required in the interest of public, they don't have to disclose it. Well, Congress amended Exemption 3 to avoid this type of situation, and Chamberlain goes through that, and they do go through the analysis, that there does need to be specific facts, and actually Curry as well goes through the standard, that number one, the reviewing court must make sure specific facts are there available for you to make an independent determination. And then number two, if the specific facts are there, you review it for clearly erroneous standard. And my position is the facts weren't there, and the court admitted they had to rely on the agent's discretion here. You may want to save your remaining time. Thank you, Your Honor. Good morning, Your Honors. Gretchen Wolfinger for the United States. First, I'd like to make clear that the government has not conceded anything. We believe that the information at issue here is in fact tax convention information, which is covered by 6105A and should remain confidential. It's only because Pacific Fisheries is relying on an exemption within domestic law, which is not applicable, that there is anything to argue about here. So if this dispute involved information that tax authorities in California had requested that had been provided from the U.S. to the state of California, it could be revealed? Frankly, Your Honor, I don't know what arrangements there are between the federal government and the states. If you are looking at the import of your question is just a general 6103 question? Yes. Okay. Any particular taxpayer, there is a provision that lets any particular taxpayer have access to their return or return information, or in this case a designee of the taxpayer. Pacific Fisheries attorneys are designees of Mr. Voloshenko, except for when producing that information would seriously impair federal tax administration. So to the extent that you're paralleling the international treaty with relations between federal and state, I presume that that is... I was trying to think of an example outside the treaty where there's been a summons for information to a financial institution, and it turns out that the summons is invalid for some reason. That's what happened here, isn't it? That's my understanding, yes. But for this treaty, is counsel correct that this information would be discoverable by the taxpayer? If the service conducts an investigation of me and sends summons to financial institutions where I do transact business, and it turns out that the summons is invalid, and that part of the case goes away, am I not entitled to find out what you asked of those financial institutions and what they told you? I don't know, Your Honor. I don't know on what basis. I don't know on the particular facts of your circumstance if it would be possible for the United States to find that producing your information would for some reason seriously impair tax administration. You mean domestic tax administration? Yes, federal tax administration. And it does happen in other contexts aside from the summons. Customarily, I believe the long cases, people ask for what I'll call program information or systemic information about internal IRS operations, and that is sometimes withheld because to produce that would seriously impair federal tax administration. You know, here's one of the problems is that Mr. O'Donnell basically says, oh, they don't want us to turn it over, and if we turn it over it would probably or likely, let's see what language he uses, it could erode mutual trust. I mean, you know, that's like almost pablum, basically. It doesn't say, you know, he says based on my experience, but he doesn't tell you any experience. In other words, he doesn't say we had a situation where we disclosed information or we found that the reason this kind of information is particularly sensitive as such and such. All he basically says is the Russian government wanted to be confidential, and he says it could disrupt. It would disrupt Russian government's confidence in the exchange of information. Well, first, I have a number of responses, I suppose. The first is that he has been, and he states in his declaration, he's been with the IRS for 22 years, so he has a fairly lengthy experience with them, and he had been Director of Treaty Administration and International Coordination when he made this declaration. So it's based on his experience. But he doesn't tell you any experience. I mean, that's the one problem. Secondly, I would argue that even if there has been experience in other contexts, as Opposing Counsel mentioned, vis-a-vis China, that does not necessarily relate to what would happen with our relationship with Russia. I take it that if this affidavit had said in so many words, trust me, I'm from the government, this would be bad news if this stuff was disclosed, that would not be enough. That, I believe, would not be enough because it was not enough in the first declaration. The district court required him to come back, Mr. O'Donnell, to come back with a second declaration in which he provided the specifics underlying his reasoning. Is it too much to ask? I mean, he did come back with a supplemental declaration. I've read it. I read it again just now. Is it too much to ask that there be some specificity? I mean, he says this would disrupt our ability to cooperate with a treaty partner. There's no example given. Well, I think Your Honor is making an assumption. You're making an assumption and responding to you, I'm making an assumption. There may be no examples. Well, then couldn't he say? I mean, in other words, here is the problem. I've been here 22 years. We got the tax treaty. The Russians don't want us to disclose it. So based on my experience, I believe that that would show future cooperation. It is such a highly conclusory affidavit, and that's why it treads even, you know, in the state secret area even. Those declarations at least give you some texture as to why it would be a problem. I mean, what do you say? Because, you know, this is how they're negotiated. This is what happens. This is the kind of information where we're a party, for example. We're one of the parties to the tax convention. And I can tell you, I, meaning Mr. O'Donnell, from my experience, you know, in the foreign relations arena, here's why it would impair our confidence if we found out the stuff we turned over was also going to go to the taxpayer. But he doesn't tell us anything. So that's the kind of stumbling block. I don't really see that he says much more in the second affidavit than he did in the first. Can you point to anything in the supplemental declaration? Well, I think that he is much more specific in the second declaration. Rather than just saying we have this relationship, he discusses that the relationship has been ongoing and beneficial. Also, what he says makes sense in the context of foreign relations, treaty relations. We've entered into this treaty. The treaty, I believe, was entered into in 1992, so it had been ongoing for a while. A relationship had developed, and he's certainly competent to say it was based on a high degree of respect and trust, and that the United States was ---- Ms. Wolfinger, let me ask you this. Wouldn't it be sufficient for Mr. O'Donnell to say that under the treaty, if one of the contracting parties requests that the other party keep it confidential, it's confidential? I think that that enters into his determination, and that certainly explains why he believes that the treaty relations would be under ---- But you don't think that would be enough? I will say this. It's certainly the ---- I don't believe that the district court believed that it was enough. There have to be ---- You know, I'm trying to think of an analogous area, and the one that occurs to me is confidential informants in criminal investigations. We would never accept, and no Article III, certainly no district judge would accept an affidavit that was this generalized. We would require the affiant to say, this informant's identity must remain confidential, because if disclosed he would be threatened, his family would be threatened, he would be killed, et cetera, et cetera. We would require some specificity that would give us confidence that the agreement to maintain confidentiality was well-founded. Why shouldn't that be demanded here? I believe that we're in two different arenas, and that may highlight a difference between opposing counsel's view of this case and mine. She's referenced criminal investigations where an ongoing investigation where information wasn't produced because the investigation was ongoing. I think that there is a difference between an investigation, a criminal investigation, and what we have here, which is a treaty relationship. Generally, a criminal investigation, although it can last a while, several years, is a discrete matter, and it will end. The second difference is, as well as here, this continuing relationship, I believe the government has every hope that it will continue indefinitely into the future, and that a problem now could have significant impact well into the future. The second difference is that in the criminal arena or an investigative arena, the government generally has all the information needed to make a determination about disclosure in its possession. It knows the nature of the criminal investigation. It knows what will happen to the informant based on the parties involved. Here, this is a treaty relationship, and we don't really know how the Russians will react to a disclosure of information. Oh, yes, you do. Mr. O'Donnell says it would disrupt the Russian government's confidence in the exchange of information process and would chill future cooperation by Russia under the U.S.-Russia Tax Convention. At least he knows how it would work out. Yes, and that is his opinion and the basis for his declaration. But as I'm saying, that does depend to some degree on actions taken by another party, whereas in the criminal arena, all the facts and the actions that will be taken are within the knowledge and ability of the United States. Not necessarily, but Judge Hawkins was giving you the hypothesis that an informant would be killed. Well, it may be. Not by the United States. Right. I don't want to stray too far, but it may be that they think the informant would be killed because threats have already been made against that person's life or they have some other information. Let me ask you, it seems to me that it might not have a pure mutuality. I can understand the claim, the Russian disclosures to us, but if it's U.S. tax information about a U.S. taxpayer, what is the risk for the U.S. to disclose that information to the taxpayer? The risk, I believe, is that the answer to the question indicates what the question is, that they are, as I believe I say in my brief, two sides of the same coin. Russia asked us for X. If we produce X to Russia, then therefore the taxpayer knows X was asked for, and it may be that they can infer something from the fact that X was asked for. Let me ask you, so if, I guess your position would be if the only thing that the U.S. sent to Russia was a copy of the taxpayer's returns, that would come under this exemption, correct? Using your hypothetical, Mr. O'Donnell would have reviewed the information and determined, yes, that release of that would seriously impair federal tax administration. So it could be anything, even if it's something as simple as tax return, which the taxpayer filed for the last five years? Yes. 6103 defines what tax return and tax return information is, so it would fall within the parameters of that statute, yes. I guess that you have an initial jumping off point that differs from specific fisheries in that you believe this information that we're talking about is actually tax convention information. Yes, and I think that that's the nature of their argument. If it were non-tax convention information, they wouldn't have to get to an exemption under 6103. They just would have argued this isn't tax convention information. Under 6105A or B, which defines it, it doesn't fit, but it clearly falls within the definition of 6105B. Yes, they're relying on the exemption of 6103 under domestic law to get disclosure. But I'd just like to highlight I believe that we have discussed that we believe tax convention information should be broadly interpreted pursuant to legislative history to cover requests from Russia, as well as information going back to Russia, and also that there's certainly no public policy hindrance to keeping this information exempt from disclosure. But the treaty relations area, I think Mr. O'Donnell was fairly specific about concerns, not only if the information were released, concerns vis-a-vis Russia, but other treaty partners, and made a fairly detailed explanation, which the district court accepted, particularly in light of his second declaration, that he did provide specific legitimate reasoning for his determination that was based on common sense, and that his determination was well-grounded in experience and speculation. I recognize, again, that the treaty area is somewhat amorphous, but that is the nature of treaty and foreign relations. So is your answer to Judge Bea's earlier question that it's enough simply for a government agent to say this would impair our relations with a treaty partner, therefore it should not be disclosed, that would be enough? As opposed to? That certainly would be sufficient, but I don't believe that I'm getting the full import of your question. No. Judge Bea's question was, isn't it enough under this treaty for an official, an appropriate official of the United States government to say this information, if disclosed, would impair relations with a treaty partner under this particular treaty, period. That would be enough. Is that what you're telling us? I believe that he would have to provide. He's supposed to provide specific reasoning for that. So what flows from the confidentiality itself. And you think the supplemental declaration provides that? Yes. Yes. Thank you. I understand your argument. Thank you. May I, Your Honors? Yes. I just have a few quick points. Under the treaty itself, it does not have an exception that says that if the partner requests it be confidential, if there's an oral request or written request, that it then should be confidential. The IRS is relying on an internal revenue manual. That's their guidelines. It has no legal effect at all. That's just their policy. That's an internal policy. So if the other side, they say, requests that, then they are going to take the imposition that it's impairment of tax administration. That is not in the treaty itself. The treaty itself, the plain language of the treaty. But isn't that a judgment that's really akin to foreign relations that the government can make? It doesn't need to be in the treaty. Well, I just wanted to clarify that it's not in the treaty itself and that they're using these guidelines. And I do want to make clear that this request for it be held confidential was solicited. They called up the Russian government and basically said, do you want us to keep this case? This wasn't something that they came back and said, we really want this to stay confidential. They actually solicited them the second time to confirm that this information, they wanted to keep secret. I think the concern here is how far do we go to accommodate foreign countries? And do we allow them to request things to stay secret when they wouldn't under our U.S. laws? I think in that situation, we could be assisting corruption. And that's the whole point of FOIA. It's a checks and balance system. And here we are relying on the unfettered discretion of an agent who's had years of experience, but who in his opinion believes it impairs. But there's no checks and balance on that. Thank you, Your Honor. Thank you both for your argument this morning and the briefing on this. The case just argued Pacific Fisheries versus the United States is submitted.
judges: Hawkins, McKeown, Bea